**** Corrected Copy ****

# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 38851

————————————

## UNITED STATES
*Appellee*

v.

## Michael R. LIGHTSEY
Airman First Class, U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 January 2017

————————————

*Military Judge:* Marvin W. Tubbs (sitting alone).

*Approved sentence:* Dishonorable discharge, confinement for 30 months, and reduction to the grade of E-1. Sentence adjudged 7 January 2015 by GCM convened at Joint Base San Antonio-Lackland, Texas.

*For Appellant:* Major Lauren A. Shure, USAF; Captain Annie W. Morgan, USAF; Captain Patricia Encarnacion Miranda, USAF; and Philip D. Cave, Esquire.

*For Appellee:* Major G. Matt Osborne, USAF; Major Mary Ellen Payne; and Gerald R. Bruce, Esquire.

Before DUBRISKE, HARDING, and C. BROWN, *Appellate Military Judges*

Judge C. BROWN delivered the opinion of the court, in which Senior Judge DUBRISKE and Judge HARDING joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

C. BROWN, Judge:

Contrary to his pleas, Appellant was convicted by a military judge sitting alone as a general court-martial of two specifications of abusive sexual contact involving a single victim in violation of Article 120, UCMJ, 10 U.S.C. § 920. The military judge acquitted Appellant of two additional specifications of abusive sexual contact involving two other victims. The approved sentence was a dishonorable discharge, confinement for 30 months, and reduction to E-1. The convening authority deferred Appellant's reduction in grade and adjudged forfeitures until action, and then waived mandatory forfeitures at action for the benefit of Appellant's dependent spouse.

Appellant raises several assignments of error on appeal: (1) his convictions are factually insufficient; (2) the military judge erred in considering the four charged specifications as propensity evidence under Military Rule of Evidence (Mil. R. Evid.) 413; (3) the military judge erred in admitting hearsay statements under Mil. R. Evid. 803; and (4) Appellant's record of trial is incomplete because Prosecution Exhibit 14 is defective.[1] Appellant also moved the court to grant him a new trial based upon newly discovered evidence. Finally, Appellant requested this court consider, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), six additional assignments of error. We address three of these below. Having considered the remainder, we find they do not merit either relief or further analysis here. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

We conclude no relief is warranted based on the remaining issues raised and thus affirm the findings and sentence.

## I. BACKGROUND

Appellant was a medical technician who worked in the Wilford Hall Post Anesthesia Care Unit (PACU), Joint Base San Antonio-Lackland, Texas. Captain (Capt) KAH, the victim in Specifications 2 and 3 of the Charge, had dental surgery at Wilford Hall. During the procedure, electrocardiogram (EKG) leads were placed on her hips and below her breasts. Capt KAH was naked at this time save for a hospital gown that tied in the back.

Capt KAH was sedated for the surgery and, after the operation, she awoke in the PACU. As a medical technician removed her EKG leads in the PACU, the person grazed her left breast in a way that Capt KAH—who had five prior dental surgeries where she was sedated and had EKG leads attached near her breasts—described as "not normal for when you take a lead off." The person

---

[1] Appellate counsel resolved the technical issue with Prosecution Exhibit 14, making this assignment of error moot.

then grabbed her left breast with his entire hand, pinched her nipple for a few seconds, and then did the same to her right breast.

After her left breast was touched, Capt KAH opened her eyes and saw half of her assailant's face. She described him as a Caucasian male with bushy eyebrows and brown hair who was wearing royal blue scrubs. He also wore a name tag with "A1C" rank and the name "Steigh or Stie" on it. The same person then slid his two fingers towards Capt KAH's crotch, but she lifted her right side off the bed to get the person's hand off her. The person then wheeled her out of the PACU on a gurney to transport her to a room in "Same Day Surgery." While in the hallway, the person stopped the gurney and placed his hand under the blanket and penetrated her labia with one finger.

When she arrived at the next room, Capt KAH's husband met her there, but she did not report the incident to him because she did not know how he would react. Approximately 20 minutes later, when her husband left for the pharmacy, Capt KAH reported the incident to a civilian nurse and her doctor who was a Captain at the time of the incident. The Air Force Office of Special Investigations (AFOSI) opened an investigation and contacted previous PACU patients to determine if they had experienced any inappropriate touching while being cared for in the PACU. The investigation led to the discovery of two additional victims, both civilians. One, Ms. MRF, alleged Appellant caused her hand to touch his penis over his clothing (Specification 1 of the Charge) and the other, Ms. DEM, alleged Appellant grabbed her breasts while taking off her EKG leads (Specification 4 of the Charge). Appellant was acquitted of the offenses involving both of these patients.

## II. DISCUSSION

### A. Factual Sufficiency.

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of [Appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.A.A.F. 1987); *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324; *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

Specifications 2 and 3 of the Charge allege Appellant committed abusive sexual contact in violation of Article 120, UCMJ. To sustain a conviction for abusive sexual contact, the prosecution was required to prove: (1) that Appellant directly touched the labia (Specification 2) and breasts (Specification 3) of Capt KAH with the intent to gratify his own sexual desire; (2) that Appellant did so by causing bodily harm to Capt KAH to wit: touching the labia (Specification 2) and breasts (Specification 3) of Capt KAH with an intent to gratify his own sexual desire; and (3) that Appellant did so without the consent of Capt KAH. *See* Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, 3-45-16.

The evidence supporting the abusive sexual contact convictions came from the testimony of Capt KAH and multiple witnesses who were working in the PACU and Same Day Surgery on the day of the alleged incident, documents detailing personnel on duty during the incident, and videos of the hospital including one showing Appellant transporting Capt KAH via a gurney from the PACU to the Same Day Surgery recovery room. Capt KAH's limited identification of Appellant as her assailant is overwhelmingly supported by the other testimony and evidence admitted at trial. Capt KAH described the sexual contact as grabbing her breasts and pinching her nipples in the PACU and then later penetration of her labia with a finger while she was being transported to Same Day Surgery. She explained how this differed from technicians touching her body during her previous five surgeries. A registered nurse responsible for Capt KAH's PACU care testified that Capt KAH's level of responsiveness as noted in the hospital's electronic charting system indicated she was not hallucinating while in the PACU and that she would not have been discharged to Same Day Surgery had he not observed a certain level of responsiveness from her.

Another medical technician testified that she and Appellant were the two technicians assigned to care for Capt KAH on the day of the incident, that medical technicians were responsible for removing EKG leads, and that she was not present when the leads were removed. She also confirmed that PACU technicians wore light blue scrubs and name tags with their last name and rank on them. The PACU nurse-in-charge on the day of the assault testified

4

that logbook entries confirmed Appellant as the medical technician caring for and transporting Capt KAH. She stated that only she, Appellant, and two other individuals were in the PACU at the time of the alleged incident and that no PACU personnel had a last name similar to Appellant. She further testified Appellant was most likely the person who removed Capt KAH's EKG leads. She then identified Appellant in a video admitted at trial. The video showed Appellant as he transported Capt KAH from the PACU to Same Day Surgery.

Ms. MP, a registered nurse who cared for Capt KAH in Same Day Surgery, testified Appellant transported Capt KAH to Same Day Surgery and the PACU logbook admitted at trial would confirm this information. She detailed Capt KAH's physical state saying "she was drowsy, but coherent" when she interacted with her. She stated Capt KAH immediately told her she needed "to talk to someone about something," and that someone had "grabbed her boobs, pinched her nipples, and touched her labia." Ms. MP testified Capt KAH told her and Capt (now Major) AK that "it was an Airman who was taking care of her in the PACU, and the name was something like 'Lights.'" Major (Maj) AK testified that Capt KAH was a little drowsy but her speech was clear when she reported the incident to him. Maj AK stated Capt KAH relayed that a medical technician had grabbed her breasts and placed their fingers in her labia. Maj AK asked her who did this and she responded "it was a Lights, Lights was the last name." The dental surgeon who performed the operation also testified that Capt KAH seemed to be more alert than what he normally observed in patients waking up from general anesthesia.

In an attempt to demonstrate Capt KAH was hallucinating when she awoke from surgery and imagined the alleged sexual contact, the Defense called an anesthesiologist who had examined Capt KAH's medical records. He testified that it was possible that Capt KAH experienced emergence delirium, a condition where patients emerging from anesthesia experience hallucinations. On cross examination, he stated he had not evaluated Capt KAH for the factors necessary to determine if she had emergence delirium and that the condition occurred in less than one percent of the entire population.

The testimony and supporting evidence clearly show Appellant committed the alleged acts and prove all of the elements of the offenses as charged. We find there is sufficient evidence to convince a rational trier of fact beyond a reasonable doubt that the Appellant is guilty of both specifications of abusive sexual contact, and that the evidence is, therefore, legally sufficient. Furthermore, after our independent review of the record and making allowances for not personally observing the witnesses, we are ourselves convinced beyond a reasonable doubt.

**B. Use of Other Charged Offenses as Propensity Evidence under Mil. R. Evid. 413.**

Appellant next alleges the military judge erred in considering the four charged specifications of abusive sexual contact as propensity evidence under Mil R. Evid. 413. Trial defense counsel objected to consideration of the offenses as propensity evidence, stating the Government had not proven by a preponderance of the evidence that each sexual assault had occurred and arguing that the probative value of the evidence was outweighed by its unfair prejudice to Appellant under Mil. R. Evid. 403.[2]

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013). "'The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *Id.* (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)).

In *United States v. Hills*, the Court of Appeals for the Armed Forces held that it was error to admit evidence of other charged offenses for the purpose of proving propensity under Mil R. Evid. 413:

> We hold that because the evidence of the charged sexual misconduct was already admissible in order to prove the offenses at issue, the application of [Mil. R. Evid.] 413—a rule of admissibility for evidence that would otherwise not be admissible—was error. Neither the text of [Mil. R. Evid.] 413 nor the legislative history of its federal counterpart suggests that the rule was intended to permit the government to show propensity by relying on the very acts the government needs to prove beyond a reasonable doubt in the same case.

*United States v. Hills*, 75 M.J. 350, 352 (C.A.A.F. 2016).

---

[2] There are three threshold requirements for admitting evidence of similar offenses in sexual assault cases under Military Rule of Evidence (Mil R. Evid.) 413: (1) the accused must be charged with an offense of sexual assault; (2) the proffered evidence must be evidence of the accused's commission of another offense of sexual assault; and (3) the evidence must be relevant under Mil R. Evid. 401 and 402. *United States v. Wright,* 53 M.J. 476, 482 (C.A.A.F. 2000). The military judge made detailed finding of facts during his ruling on the propensity evidence, outlining the evidence presented on each specification. He ultimately found that panel members could find by a preponderance of the evidence that the offenses occurred. He also conducted a detailed Mil. R. Evid. 403 balancing test prior to admitting the evidence as required under *United States v. Berry*, 61 M.J. 91 (C.A.A.F. 2005).

The facts in *Hills* were substantially different from this case as *Hills* addressed a single victim with multiple charged offenses all occurring at essentially the same time and place. Here, Appellant was charged with offenses against three different women in separate incidents on three different days in the same month. The court in *Hills*, however, did not limit its holding to the facts of that case. Thus, the military judge erred by considering evidence of other charged offenses for purposes of propensity under Mil. R. Evid. 413.

Regarding the assessment of prejudice, Appellant argues the military judge's error must be examined under the more stringent standard of harmless beyond a reasonable doubt as there is "no good cause to distinguish between members or a military judge as fact-finder" and noting the military judge is presumed to have followed the same instructions found deficient in *Hills*. We disagree, and instead apply Article 59(a), UCMJ, 10 U.S.C. § 859(a), when a military judge sitting alone errs by considering charged offenses as propensity evidence. *See United States v. Rambharose*, ACM 38769, unpub. op. at 15 (A.F. Ct. Crim. App. 15 December 2016). In so holding, we note military judges are presumed to know the law and to follow it, absent clear evidence to the contrary. *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997). This presumption includes the ability to maintain the presumption of innocence and to apply the appropriate burden of proof in assessing Appellant's guilt—issues "seriously muddled and compromised" by the instructions provided to court members in *Hills*, 75 M.J. at 357. While we recognize the military judge committed evidentiary error by considering charged offenses for propensity, we cannot extend this error to encompass the constitutional concerns present in *Hills* absent evidence to the contrary. We have no reason to believe the military judge misapplied either the presumption of innocence or the burden of proof in assessing Appellant's guilt. *See United States v. Wright*, 53 M.J. 476, 481 (C.A.A.F. 1997). We thus assess not constitutional, instructional error here, but non-constitutional, evidentiary error. *United States v. Solomon*, 72 M.J. 176, 182 (C.A.A.F 2013).

A finding or sentence of court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused. Article 59(a) UCMJ, 10 U.S.C. § 859. For a non-constitutional error such as this one, the Government has the burden of demonstrating that "the error did not have a substantial influence on the findings." *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003). We evaluate whether erroneous admission of Government evidence is harmless using a four-part test, weighing: (1) the strength of the Government's case, (2) the strength of the Defense's case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question. *United States v. Berry*, 61 M.J. 91, 98 (C.A.A.F. 2005).

As outlined in our legal and factual sufficiency analysis, the Government's case for the allegations involving Capt KAH was very strong, especially considering the victim's contemporaneous report of the abuse. The Defense's case consisted of cross-examination of Capt KAH on her identification of Appellant and other details of her version of the events including the shade of blue of her assailant's scrubs and the fact that her description of his height and weight didn't match Appellant's actual height and weight. On this issue, the Government introduced a significant amount of testimony, documentary evidence, and a video confirming that Appellant was Capt KAH's assailant. Trial defense counsel also spent significant time on cross-examination and through the testimony of their expert anesthesiologist exploring the possibility that the sexual contact described by Capt KAH was a hallucination caused by her anesthesia. As noted above, however, the expert's testimony on this theory was not particularly persuasive.

The evidence for Specifications 1 and 4, on the other hand, was far less compelling and rested mainly with the testimony of the victims, with one of them failing to definitively identify her assailant. The Government also introduced documentary evidence showing Appellant cared for both victims. This evidence connecting Appellant to the victims was significantly weaker than the evidence for those offenses involving Capt KAH as trial counsel noted in his response to trial defense counsel's motion for a finding of not guilty under Rule for Courts-Martial (R.C.M.) 917. In his ruling on the R.C.M. 917 motion, the military judge noted there was "some evidence" to support Specifications 1 and 4, and later found in his Mil R. Evid. 413 ruling that a jury could find all four offenses occurred under a preponderance of the evidence standard. However, he ultimately acquitted Appellant of these specifications, demonstrating that he looked at each specification and made a determination based on the evidence for each offense. He also acknowledged a clear understanding of spillover and its associated principles. For these reasons, our review of the record shows the propensity evidence was of marginal value and that the error did not did not have a substantial influence on the findings. In fact, even if we were to apply the stricter constitutional standard in this case, based on our analysis above, we would find the error harmless beyond a reasonable doubt.

## C. Admission of Statements to Providers under Mil. R. Evid. 803.

Appellant asserts the military judge erred in admitting Capt KAH's statements to Ms. MP and Maj AK concerning the alleged sexual contact as exceptions to hearsay under Mil R. Evid. 803(1). We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010). The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.

*White*, 69 M.J. at 239 (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)).

Mil. R. Evid. 803 provides, in part, that a present sense impression—that is, a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it"—is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness. Mil. R. Evid. 803(1).

At trial, Ms. MP testified that she saw Capt KAH as she was coming out from the PACU during her post-operative care. She stated Capt KAH was "still drowsy but she was coherent." She went on to relate that Capt KAH said she was "sexually assaulted." Finding this testimony fell within the present sense impression exception, the military judge overruled a Defense objection that it amounted to impermissible hearsay. We find no abuse of discretion. Ms. MP was one of the first individuals Capt KAH encountered after Appellant had sexually assaulted her and her statement described or explained an event immediately after she perceived it. Mil. R. Evid. 803(1).

Similarly, Capt KAH's statement to Maj AK came in under the same exception. Upon Capt KAH telling Ms. MP she had been sexually assaulted, Ms. MP brought her to Maj AK's office. Maj AK described Capt KAH as "drowsy," noting that "her words were clear and coherent, but just a little bit slow." Maj AK testified to additional statements that Capt KAH made. We cannot find as clearly erroneous the military judge's conclusion that the complaint—which occurred within 20 minutes of the incident—"immediately" followed the event. Mil. R. Evid. 803(1). We thus find no abuse of discretion.

## D. Failure to Sever Specifications 1 and 4 of the Charge.

Appellant asserts the military judge erred in denying his motion to sever Specifications 1 and 4 from the remaining Specifications.[3] We review this ruling for abuse of discretion. *United States v. Duncan*, 53 M.J. 494, 497-98 (C.A.A.F. 2000).

A convening authority has discretion to refer two or more offenses against an accused to the same court-martial for trial, whether serious or minor and regardless of whether related. R.C.M. 601(e)(2). R.C.M. 906(b)(10) permits a military judge to sever offenses, "but only to prevent manifest injustice"—acknowledging in the discussion that "[o]rdinarily, all known charges should be

---

[3] Appellant raised this issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982)

tried at a single court-martial." R.C.M. 906(b)(10) and its Discussion. Severance is one way to avoid impermissible spillover of evidence from the proof of one offense into the trial of another that would otherwise deny an accused the right to a fair trial. *Duncan*, 53 M.J. at 497.

We consider three factors when reviewing a military judge's denial of a severance motion for an abuse of discretion: (1) whether the evidence of one offense would be admissible proof of the other; (2) whether the military judge has provided a proper limiting instruction; and (3) whether the findings reflect an impermissible crossover of evidence. *United States v. Curtis*, 44 M.J. 106, 128 (C.A.A.F. 1996).

In general, "an abuse of discretion will be found only where the defendant is able to show that the denial of a severance caused him actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have provided him with a better opportunity for an acquittal." *Duncan*, 53 M.J. at 497-98 (internal quotation marks and citation omitted).

Here, the military judge made specific findings of fact and analysis that properly applied the *Curtis* test. While noting that there was, at that point, an incomplete record regarding the admissibility of the offenses to prove the others, he found the Defense failed to demonstrate that appropriate limiting instructions would not suffice and thus found they failed to demonstrate that manifest injustice would occur.

Particularly in this judge-alone setting, we find no evidence of impermissible crossover. "One factor which carries great weight is the findings, themselves, which may reveal whether or not an impermissible crossover caused the presence of a charge on which the evidence was strong to result in conviction of charges on which the evidence was relatively weak." *Curtis*, 44 M.J. at 128 (internal quotation marks and citation omitted). Here, the military judge convicted Appellant of two specifications where significant corroborating evidence existed, but acquitted him of two weaker specifications. Appellant is, therefore, hard-pressed to show he was prejudiced. While Appellant asks us to analyze the severance issue in conjunction with the *Hills* propensity issue, the *Hills* court specifically found the propensity issue to have no bearing on its jurisprudence on joinder and severance. *Hills*, 75 M.J. at 357, n.4.

We find the military judge did not abuse his discretion in denying Appellant's motion to sever Specifications 1 and 4 from the remaining Specifications.

## E. Petition for New Trial.

Appellant also moved this court to grant him a new trial because the named victim in Specification 1—Ms. MRF—"recanted her allegation," and the recantation was "newly discovered evidence."

A petition for new trial is not favored and, absent a manifest injustice, will not be granted. *United States v. Williams,* 37 M.J. 352, 356 (C.M.A. 1993). The petitioner bears the heavy burden of establishing that a new trial is a proper remedy. *United States v. Giambra,* 38 M.J. 240 (C.M.A. 1993). New trials may be based on newly discovered evidence or fraud on the court. Article 73, UCMJ, 10 U.S.C. § 873. A new trial will not be granted on the grounds of newly discovered evidence unless the petitioner shows that: (1) the evidence was discovered after the trial; (2) the evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and (3) the newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused. R.C.M. 1210(f)(2).

Ms. MRF's "recantation" pertains only to new-found doubts about the identity of her assailant. She testified at trial that while she was in the PACU waking up from surgery, a man grabbed her hand, placed it on his genitalia, and rubbed it back and forth. Ms. MRF did not open her eyes until she was in a private room with her husband. She reiterated on cross-examination that she never opened her eyes during the alleged sexual contact and never saw her assailant's hand, but she felt it with her hands. Yet months after trial, Ms. MRF contacted the trial counsel and stated that she had come to doubt whether it was Appellant who had sexually assaulted her, citing differences between the appearance of Appellant and his hands at trial, and memories of the appearance of her assailant.

But irrespective of the credibility of this post-trial statement and whether it qualifies as "newly discovered evidence," Appellant was acquitted of assaulting Ms. MRF and we have already concluded that evidence related to her offense did not substantially influence the guilty verdicts in this case. Appellant has thus failed to show that this evidence would, if considered by a court-martial in the light of all other pertinent evidence, probably produce a substantially more favorable result for him. R.C.M. 1210(f)(2)(c). We thus deny his request for a new trial.

## F. Ambiguity of Convening Authority's Action.

Appellant next asserts the convening authority's action is ambiguous as to the execution of Appellant's dishonorable discharge and asks the court to affirm no more than a bad-conduct discharge.[4]

---

[4] Appellant raised this issue pursuant to *Grostefon*, 12 M.J. 431.

Appellate courts "may act only with respect to the findings and sentence as approved by the convening authority." Article 66(c), UCMJ. Convening authority's actions must therefore be clear and unambiguous. *United States v. Politte*, 63 M.J. 24, 26 (C.A.A.F. 2006).

In this case, the convening authority's action explicitly states that "only so much of the sentence as provides for a dishonorable discharge, confinement for thirty months, and a reduction to the grade of E-1 is approved and, except for the dishonorable discharge, will be executed." The action plainly approves the dishonorable discharge but does not order it executed, as that step must await completion of appellate review. *United States v. Bailey*, 68 M.J. 409 (C.A.A.F. 2009). Finding no ambiguity, we deny relief.

**G. Post-trial Processing.**

In *United States v. Moreno*, our superior court established a presumption of unreasonable post-trial delay when the convening authority does not take action within 120 days of trial, when a record of trial is not docketed with the service court within 30 days of the convening authority's action, and when this court does not render a decision within 18 months of the case being docketed. 63 M.J. 129, 142 (C.A.A.F. 2006). Appellant now asserts we should grant him modest sentence relief because 141 days elapsed between announcement of sentence and convening authority's action, and 57 days elapsed between the convening authority's action and docketing with this court, exceeding the *Moreno* standard by 21 and 27 days respectively.[5]

There are two steps to our analysis of whether Appellant is entitled to relief. First, we determine whether the delay in this case amounts to a denial of Appellant's due process right to speedy post-trial review and appeal. *Id.* at 135. Next, even if we find no due process violation, we also consider whether this court should exercise its power under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to grant relief for excessive post-trial delay. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

We consider four factors in determining whether post-trial delay amounts to a violation of due process rights: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005), *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at

---

[5] Appellant raised this issue pursuant to *Grostefon*, 12 M.J. 431.

135 (citing *Barker v. Wingo*, 407 U.S. 514, 533 (1972)). However, when an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

As noted above, the lapse of time between sentence and convening authority's action exceeded the *Moreno* standard by 21 days. Similarly, the time between action of Appellant's court-martial and the docketing of his case with this court exceeded the *Moreno* standard by 27 days, establishing a facially unreasonable delay for both portions of the post-trial process. Therefore, the next question we consider is whether Appellant has been prejudiced by the delay. *Toohey*, 63 M.J. at 362. Appellant does not identify any specific "particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision," and we find none. *Moreno*, 63 M.J. at 142. The Government's explanation for the delay in obtaining action includes the court reporter's overall workload and her absence from work caused by her duties as a military reservist, as well as Appellant's submission of additional matters requiring a second addendum to the staff judge advocate's recommendation. In terms of the delay in docketing the case with this court following action, the Government submits that the original record of trial was damaged in transit and had to be sent back for reconstruction. Balancing the remaining factors, though we find the Government's explanation for the multiple delays in violation of the *Moreno* standard less than compelling and note Appellant's assertion of his right to timely review, we are convinced the delay was not so egregious as to undermine the appearance of fairness and integrity within the military justice system. Therefore, we find no due process violation.

Next, we consider whether Article 66(c), UCMJ, relief pursuant to *Tardif* is appropriate. 57 M.J. at 224. We are guided by factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), with no single factor being dispositive.[6] We are mindful of our

---

[6] These factors include: (1) How long the delay exceeded the standards set forth in *Moreno*; (2) What reasons, if any, the Government set forth for the delay, and whether there is any evidence of bad faith or gross indifference to the overall post-trial processing of this case; (3) Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, whether there is nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay; (4) Whether the delay has lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline; (5) Whether there is any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation; and (6) Given the passage of time, whether this court can provide meaningful relief in this particular situation.

superior court's admonition that "delay in the administrative handling and forwarding of the record of trial and related documents to an appellate court is the least defensible of all [post-trial delays] and worthy of the least patience." *United States v. Dunbar*, 31 M.J. 70, 73 (C.M.A. 1990) (internal hyphens omitted). Again, we note the Government's explanation for the delays, though clearly not intentional, is not overly compelling. Nevertheless, considering the remaining *Gay* factors, we conclude no extraordinary exercise of our Article 66(c), UCMJ, authority is warranted. We discern no particular harm to Appellant from the delay. The delay has also not lessened the disciplinary effect of Appellant's sentence. Finally, the delay has not adversely affected this court's ability to review Appellant's case or grant him relief, if warranted. Taken as a whole, the circumstances do not move us to reduce an otherwise appropriate sentence.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court